IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JAIMIE HEARD, individually, and on behalf of all others similarly situated,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>FIRST COMMUNITY CREDIT UNION, and DOES 1-5,<br><br>　　　　　　Defendant. | **Civil Action No.:** 4:21-cv-3690<br><br>**JURY TRIAL DEMANDED** |

## I    CLASS ACTION COMPLAINT

Plaintiff Jaimie Heard ("Plaintiff"), by her attorneys, hereby brings this class and representative action against First Community Credit Union and DOES 1 through 5 (collectively "First Community" or "Defendant").

## II    INTRODUCTION

1.　　Plaintiff brings this lawsuit on behalf of herself and First Community's members, on the basis that First Community has violated and continues to violate federal and Texas law. First, Federal Reserve Regulation E, 12 C.F.R. § 1005.1, *et seq*., ("Regulation E") requires that before financial institutions charge overdraft fees on one-time debit card and ATM transactions, they must (1) provide a complete, accurate, clear, and easily understandable disclosure document of their overdraft services (opt-in disclosure agreement); (2) provide its disclosures in a stand-alone document not intertwined with other disclosures; (3) obtain verifiable affirmative consent

of a customer's agreement to opt into the financial institution's overdraft program; and (4) provide confirmation of the given consent to the customer, including a statement informing the customer of the right to revoke such consent. Financial institutions are not permitted to include any additional information in the opt-in disclosure agreement unless specifically authorized by Regulation E. Financial institutions must ensure these procedures are followed no matter the medium used to offer customers the option to opt-in, whether online, by telephone, or in person at a branch. Financial institutions must not tie other benefits to an opt-in decision or use pre-checked boxes by the "opt-in" option on the opt-in disclosure agreement. Moreover, regulators have warned that financial institutions should not aggressively market the benefits of Regulation E overdraft coverage, promote the coverage as a short-term credit, or otherwise encourage customers to opt-in.

2.      In order to comply with Regulation E, First Community must provide members with a Regulation E opt-in disclosure agreement that accurately describes its overdraft services. But, based on information and belief, First Community does not provide its members, including Plaintiff, with an accurate and/or easily understandable Regulation E opt-in disclosure agreement describing the circumstances or conditions in which First Community charges overdraft fees. First Community also fails to follow proper procedures pursuant to Regulation E for opting-in members to its overdraft services.

3.      Because Regulation E does not permit financial institutions to charge overdraft fees until they obtain affirmative consent through proper opt-in procedures, including an accurate disclosure of their overdraft practices in a stand-alone opt-in disclosure agreement, First Community's assessment of all overdraft fees against members for one-time debit card and ATM transactions has been and continues to be illegal. Further, First Community's continued use of

improper opt-in procedures, including a non-conforming disclosure agreement to "opt-in" new members to its overdraft service is invalid. Regulation E provides a cause of action against financial institutions that fail to abide by its requirements.

4.      First Community's actions also violate the Texas Deceptive Trade Practices Act – Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41, *et seq.* ("DTPA"). First Community's failure to satisfy Regulation E and TISA provides the prerequisite legal violations for demonstrating that First Community has also violated the DTPA.  First Community violates the DTPA by engaging in false, misleading, or deceptive acts or practices in the conduct of any trade or commerce by advertising its overdraft program as a *"safety net"* that provides customers with *"extra cash for an emergency."* This is false, misleading and deceptive because First Community is not providing customers with monetary help or a "safety net" but instead is doing the opposite by charging them exorbitant, penalty-like fees. First Community also encourages members to opt-in to the overdraft program by claiming that the program can help *"keep a small oversight small."*  Such language is false, misleading, and/or deceptive in that it misrepresents the exorbitant fees of up to $35.00 that First Community charges each member opted into the overdraft program for each overdraft transaction. First Community never explains to members the reality of the overdraft program, which can turn a $4 Starbucks cup of coffee into a $40 cup of coffee.  Advertising the overdraft program in this manner violates both Regulation E and the Truth in Savings Act ("TISA") directed specifically at credit unions, found at 12 C.F.R. § 707.1, *et seq*.

5.      Notwithstanding the aforementioned Regulation E and TISA violations, First Community independently violates the DTPA's provisions because First Community, *inter alia*, represented in the Overdraft Privilege (ODP) disclosure that its overdraft and NSF fee program

had characteristics, uses, or benefits which it does not have, in violation of Texas Business and Commerce Code section 17.50(a)(1), advertised its overdraft program in its ODP disclosure with intent not to sell it as advertised, in violation of Texas Business and Commerce Code section 17.46(b)(9); and/or represented that the overdraft and NSF program confers or involves rights, remedies, or obligations which it does not have or involve, in violation of Texas Business and Commerce Code section 17.46(b)(12).

6.      Finally, First Community wrongfully and without authorization, unilaterally and without warning, withdrew money from Plaintiff and the Class Members' checking accounts when unauthorized by contract or equities to do so. Defendant falsely claimed that the funds it unilaterally took from Plaintiff's account were properly assessed Non-Sufficient Funds ("NSF") fees (a fee for a transaction that was returned unpaid) or overdraft fees (a fee for a transaction item that was advanced and paid by Defendant on behalf of Plaintiff). However, Defendant was only authorized to assess one fee per transaction item and instead assessed multiple NSF fees for the same item, or an NSF fee followed by an overdraft fee on the same item in violation of its contracts and disclosures with Plaintiff and the putative class.

7.      Based on First Community's violations of the law, Plaintiff seeks statutory damages, as well as the return of improperly charged overdraft and NSF fees within the applicable statute of limitation periods. Plaintiff also seeks to enjoin First Community from continuing to obtain new members' "consent" to be assessed overdraft fees by using an opt-in disclosure agreement that violates Regulation E and from continuing to assess any further overdraft fees on Regulation E transactions until it obtains current members' consent using a legally conforming Regulation E opt-in disclosure agreement.

### III      <u>NATURE OF THE ACTION</u>

8.     All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or counsel (unless otherwise stated). Allegations pertaining to Plaintiff or counsel are based upon, *inter alia*, Plaintiff or counsel's personal knowledge, as well as Plaintiff or counsel's own investigation. Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

9.     Plaintiff has brought this class and representative action to assert claims in her own right, and as the class representative of all other persons similarly situated. Regulation E requires First Community to obtain informed consent, by way of a written stand-alone document that fully and accurately describes in an easily understandable way its overdraft services, before charging members an overdraft fee on one-time debit card and ATM transactions. Because of the substantial harm caused by large overdraft fees on relatively small debit card and ATM transactions, Regulation E requires financial institutions to put all mandated overdraft information in one clear and easily understood document. Financial institutions are not permitted to circumvent this requirement by referencing, or relying on, their account agreements, disclosures, or marketing materials. Regulation E expressly requires a financial institution to include all the relevant terms of its overdraft program within the four corners of the document, creating a separate agreement with account holders regarding the institution's Regulation E overdraft policies.

10.     Similarly, to the extent First Community markets or advertises its overdraft services, such materials must not be misleading, inaccurate, or misrepresent the account's terms in any way.

11.     First Community does not meet these requirements.  On information and belief, First Community does not provide members with a compliant stand-alone Regulation E opt-in disclosure agreement because, *inter alia*, it fails to accurately and in an easily understandable manner describe its overdraft procedures within the four corners of the opt-in agreement.  In addition, First Community fails to follow the opt-in procedures prescribed by Regulation E. Furthermore, First Community misrepresents and/or promotes its overdraft services in a false, misleading and deceptive manner in violation of Regulation E, TISA, and the DTPA.

12.     On information and belief, First Community uses an opt-in disclosure agreement that fails to state or clearly describe that an overdraft occurs when the "available balance" is below zero when that is its practice.  While the law permits First Community to use the "available balance," which takes into account various holds on funds that are in the account in calculating whether an overdraft has occurred, Regulation E equally requires First Community to clearly and unambiguously disclose how it calculates overdrafts and under what conditions fees are charged.

13.     Further, First Community uses opt-in methods that do not comply with Regulation E.  Based on information and belief, for those members who opt-in at a branch location, First Community does not read or otherwise provide the terms of its opt-in disclosure agreement (although inaccurate) prior to obtaining members' "consent" to join the program, which is a clear Regulation E violation.  Further, based on information and belief, First Community fails to have its members sign or affirm their consent to be included in the overdraft program as Regulation E requires, nor does First Community send members confirmation letters documenting their decision to opt-in. First Community further fails to disclose that members can opt-out of the

program at any time, another necessary step under Regulation E. Each of these actions or lack of actions constitutes a separate violation under Regulation E.

14.     First Community also fails to comply with Regulation E and TISA's requirements that account disclosures be presented clearly, and in a non-misleading way.  First Community provides its members with an "Overdraft Privilege (ODP)" disclosure stating that "You can keep your *small oversights small* with Overdraft Privilege." In addition, the disclosure states that "FCCU can make sure that a *small concern won't get any bigger* with Overdraft Privilege." But there is nothing "small" about the fees associated with First Community's overdraft program.  In fact, using Overdraft Privilege incurs a fee anywhere from $10.00 to an astronomical $35.00 per item.

15.     The ODP disclosure provides further false, misleading, and/or deceptive information by stating "ensure your *safety net* is there if you need it and opt-in today" and "once your selection has been processed, *you will be covered if you need some extra cash for an emergency or unexpected situation."* First Community's disclosure and/or advertisement of its overdraft program as a "safety net" and stating that customers "will be covered" and given "extra cash" is a deceptive and misleading marketing tactic aimed at encouraging members to opt-in to the overdraft program. In many, if not most cases, members end up with less cash at the end of the day than they started with.

16.     First Community's actions also violate the DTPA because First Community's conduct violates public policy, TISA, and Regulation E.

17.     Finally, First Community has breached its contracts with its members, including Plaintiff.  In its contracts with members, First Community states it will only charge one NSF fee per item.  However, in practice, First Community assesses multiple NSF fees, or an NSF fee

followed by an overdraft fee, on the same transaction item.  This practice is not authorized by contract or equities.

18.     Plaintiff has been harmed by First Community's violations of these regulations, statutes, and contracts. On information and belief, Plaintiff was opted in to First Community's Regulation E overdraft program without being provided an accurate, non-ambiguous disclosure agreement that adequately described First Community's overdraft practices. Further, First Community has assessed overdraft fees against Plaintiff even though it obtained Plaintiff's "consent" using improper procedures and/or the non-compliant opt-in agreement. Finally, Plaintiff has been assessed NSF and/or overdraft fees in violation of her contract with First Community.  Accordingly, this action seeks statutory and monetary damages, restitution, and injunctive relief due to, *inter alia*, First Community's policy and practice of obtaining "affirmative consent" using improper practices and a noncompliant opt-in disclosure agreement while improperly advertising and marketing its overdraft services and violating its contractual terms with members.

## IV      <u>PARTIES</u>

19.     Plaintiff Jaimie Heard is a resident of Houston, Texas, and a citizen of the State of Texas. She has been a member of First Community at all relevant times.

20.     Based on information and belief, First Community does business as First Community Credit Union, with its headquarters located in Houston, Texas, and branches located throughout the state of Texas.

21.     Without limitation, defendants DOES 1 through 5, include agents, partners, joint ventures, subsidiaries and/or affiliates of Defendant and, upon information and belief, also own and/or operate Defendant's branch locations. As used herein, where appropriate, the term

"Defendant" is also inclusive of defendants DOES 1 through 5.

22.    Plaintiff is unaware of the true names of defendants DOES 1 through 5. Defendants DOES 1 through 5 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants DOES 1 through 5 when the true names are ascertained, or as permitted by law or the Court.

23.    There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that they effectively operate as a single enterprise or are mere instrumentalities of one another.

24.    At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the acts of the other defendants. However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

25.    Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

26.    As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

## V    JURISDICTION AND VENUE

27.    This Court has federal question subject matter jurisdiction over this case under 28 U.S.C. § 1331 and 15 U.S.C. § 1693m, and has supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367(a). This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregated claims of the individual class members exceed the sum of $5,000,000, exclusive of interest and costs; there are more than 100 putative class members defined below; and there are numerous members of the proposed class who are citizens of a state different from Defendant.

28.    Venue is proper in this District, among other reasons, pursuant to 28 U.S.C. § 1391(b), because Defendant entered into its contract with Plaintiff in this District; Defendant is headquartered in this District; Defendant breached its contract in this district; Defendant regularly conducts business in this District; and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District. Venue is proper in this division because Plaintiff resides in the division; Plaintiff's account is held in this division; and a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this division.

## VI    BACKGROUND

### A.    DEFENDANT FIRST COMMUNITY CREDIT UNION

29.    First Community is a credit union headquartered in Houston, Texas. According to its website, First Community is one of the area's largest credit unions, it claims in large part due to its philosophy of "putting people FIRST." First Community has approximately 18 branches

throughout Texas, and membership is open to anyone who lives, works, or worships in Harris, Fort Bend, or Montgomery Counties.

30.    On its website, First Community states that it has more than 140,000 members, and that it holds over $1.9 billion in assets. According to financial disclosures, First Community reports that in 2020 alone, it collected over $9.8 million in fee income, of which overdraft and NSF fees are believed to be a significant percentage.

31.    One of the main services First Community offers to members is a "share draft" or checking account, where members can deposit and withdraw their money.[1] A checking account balance can increase or be credited in a variety of ways, including automatic payroll deposits; electronic deposits; incoming transfers; deposits at the branch; and deposits at ATM machines. Debits decreasing the amount in the checking account can be made by using a debit card for purchases of goods and services (point of sale purchases) that can be one-time purchases or recurring automatic purchases; through withdrawal of money at an ATM; or by electronic purchases. Additionally, some of the other ways to debit the account include writing checks; issuing electronic checks; scheduling Automated Clearing House (ACH) transactions (which can include recurring automatic payments or one-time payments); transferring funds; and other types of transactions that debit from a checking account.

32.    In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), Defendant assesses overdraft fees (a fee for paying an overdrawn item) and NSF fees (a fee for a declined, unpaid returned item) to its members' accounts when it claims to have determined that an account has been overdrawn.

---

[1] Share draft account is a credit union's formal nomenclature for what is more commonly known as a "checking" account at banks.

33.    The underlying principle for charging overdraft fees is that when a financial institution pays a transaction by advancing its own funds to cover the account holder's insufficient funds, it may charge *a contracted* fee, provided that charging the fee is not prohibited by some legal regulation. The fee Defendant charges here constitutes very expensive credit in the overdraft context that harms the poorest customers and creates substantial profit. According to a 2014 Consumer Financial Protection Bureau ("CFPB") study:[2]

- Overdraft and NSF fees constitute the majority of the total checking account fees that customers incur.

- The transactions leading to overdrafts are often quite small. In the case of debit card transactions, the median amount of the transaction that leads to an overdraft fee is $24.

- The average overdraft fee for bigger banks is $34 and $31 for smaller banks and credit unions.

Accordingly, as highlighted in the CFPB Press Release related to this study:

> Put in lending terms, if a consumer borrowed $24 for three days and paid the median overdraft of $34, **such a loan would carry a 17,000 percent annual percentage rate (APR).** [3]

34.    Financial institutions can also charge a *contracted* NSF fee when an account holder's checking account purportedly lacks sufficient funds to cover an item and the financial institution opts to return the transaction item unpaid rather than cover it. Although there is very little, if any, risk to financial institutions when they return an item unpaid, they still charge

---

[2] https://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf [last viewed October 18, 2021].

[3] CFPB, CFPB Finds Small Debit Purchases Lead to Expensive Overdraft Charges (7/31/2014) consumerfinance.gov/about-us/newsroom/cfpb-finds-small-debit-purchases-lead-to-expensive-overdraft-charges/ [last viewed October 18, 2021] (emphasis added).

account holders a very expensive fee for this purported "service."

35.     The CFPB has noted that, as opposed to overdraft program coverage, financial institutions' return of items as unpaid, which often results in the assessment and collection of insufficient funds fee charges (which the CFPB refers to as "NSF fees"), confers little, if any, benefit to consumers:

> An important consumer outcome of any overdraft program is the percentage of negative transactions that are paid (*i.e.*, result in overdrafts) or returned unpaid (*i.e.*, were NSFs). Paying overdraft transactions may confer some benefit (in exchange for the associated fees and other costs) to consumers by helping them make timely payments and avoid late penalty fees and/or interest charges from a merchant or biller. **In contrast, returning an item generally confers little benefit to the consumer (other than perhaps deterring future overdrafting and any subsequent consequences) and can result in an NSF fee as well as additional related fees, such as a returned check fee charged by the institution to whom the check was presented or a late fee charged by the entity to whom payment was due.**[4]

36.     Overdraft and NSF fees constitute a primary revenue generator for banks and credit unions.  According to one banking industry market research company, Moebs Services, banks and credit unions in 2018 alone generated an estimated $34.5 billion on overdraft fees.[5]

37.     While credit unions portray themselves as more overdraft and fee friendly than banks—and that may have been historically true—it is not true now. Moebs Services reported that 2018 credit union overdraft revenue jumped $500 million, even as bank overdraft revenue declined by $400 million. Further, the same study showed that credit unions generated

---

[4] CFPB, CFPB Study of Overdraft Programs (June 2013), p. 26 (internal footnote omitted) (emphasis added), https://files.consumerfinance.gov/f/201306_cfpb_whitepaper_overdraft-practices.pdf [last viewed October 4, 2021].

[5] Moebs Services, *Overdraft Revenue Inches Up in 2018* (Mar. 27, 2019), http://www.moebs.com/Portals/0/pdf/Articles/Overdraft%20Revenue%20Inches%20Up%20in%202018%200032719-1.pdf?ver=2019-03-27-115625-283 [last viewed October 4, 2021].

significantly more revenue per member in service fees than banks did.[6] And none of this is any surprise, because from 2000 to 2017, the average credit union overdraft fee increased from $15 to $29.[7]

38.    First Community's financial filings and practices reveal that it has followed these trends to the letter. Though First Community advertises on its website that it is puts "people FIRST" and that it takes a fee-friendly approach in its OPD agreement—stating, for instance, that it provides a "safety net" and "extra cash in an emergency"—First Community charges an overdraft/NSF fee of $35 per item, higher than the average usually charged at comparable institutions. Even if First Community had been properly charging overdraft and NSF fees, its $35 fee bears no relation to its minute risk of loss or cost for administrating its overdraft services. Nevertheless, the fee's practical effect is to charge those who pay it for overdraft purposes an interest rate with an APR in the thousands. And those effects simply compound when First Community charges multiple $35 fees on a single transaction item.

39.    Accordingly, an overdraft/NSF fee is a punitive fee rather than a service fee, which makes it even more unfair because most account overdrafts are accidental and involve a small amount of money in relation to the fee. In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their accounts by mistake.[8] More than 60% of the

---

[6] Credit Union Times, *Overdraft Revenue Surges at Credit Unions: Moebs* (Jan. 7, 2019), https://www.cutimes.com/2019/01/07/overdraft-revenue-surges-at-credit-unions-moebs/ [last viewed October 4, 2021].

[7] MarketWatch, *The Average Credit Union Overdraft Fee Has Almost Doubled Since 2000* (March 27, 2017) https://www.marketwatch.com/story/credit-unions-charge-almost-as-much-as-major-banks-in-overdraft-fees-2017-03-24 [last viewed October 4, 2021].

[8] Pew Charitable Trust Report, *Overdraft America: Confusion and Concerns about Bank Practices*, at p. 4 (May 2012), https://www.pewtrusts.org/en/research-and-analysis/issue-briefs/2012/05/03/overdraft-america-confusion-and-concerns-about-bank-practices [last viewed October 4, 2021].

transactions that resulted in a large overdraft fee were for less than $50.[9] More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program, and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than being charged a very large fee.[10]

40.     Finally, the financial impact of these fees falls on the most vulnerable among the banking population with the least ability to absorb them. Younger, lower-income, and non-white account holders are among those most likely to be assessed overdraft fees.[11] A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old. More than 50% of the customers assessed overdraft fees earned under $40,000 per year. And non-whites are 83% more likely to pay an overdraft fee than whites.[12]

## B.    THE REGULATORY RESPONSE TO THE HARM CAUSED TO ACCOUNT HOLDERS BY OVERDRAFT AND NSF FEES

41.     In response to financial institutions' use of overdraft and NSF fees as profit centers at the expense of vulnerable customers, the federal government stepped in to provide additional protections to customers with respect to overdraft policies. The regulations relevant to overdraft fees are found in the Electronic Fund Transfer Act ("Regulation E"), 12 C.F.R. § 1005.1, *et seq*. and the Truth in Savings Act ("TISA") directed specifically at credit unions, found at 12 C.F.R. § 707.1, *et seq.*

---

[9] (Pew Charitable Trust Report, *Overdrawn*, at p. 8 (June 2014), https://www.pewtrusts.org/-/media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf [last viewed October 4. 2021].)

[10] *Id.*, at pgs. 5, 10.

[11] *Id.*, at p. 1.

[12] *Id.,* at pgs. 3-4.

1.        **THE ELECTRONIC FUND TRANSFER ACT (REGULATION E)**

42.      For many years, banks and credit unions have offered overdraft services to their

account holders. Historically, the fees these services generated were relatively low, particularly

when methods of payment were limited to cash, check, and credit card. But the rise of debit card

transactions replacing cash for smaller transactions—especially for younger customers who

carried lower balances—provided an opportunity for financial institutions to increase the number

of transactions in a checking account that could potentially be considered overdraft transactions,

and for which the financial institution could assess a hefty overdraft fee. The increase in these

types of transactions was timed perfectly for financial institutions, which faced falling revenue as

a result of lower overall interest rates and the rise of competitive innovations such as no-fee

checking accounts. Financial institutions thus recognized in overdraft fees a new and increasing

revenue stream.

43.      As a result, the overdraft process became one of the primary sources of revenue

for financial depository institutions—banks and credit unions—both large and small. As such,

financial institutions became eager to provide overdraft services to consumers because not only

do overdrafts generate revenue, they do so with little risk. When an overdraft is covered, it is on

average repaid in three days, meaning that the financial institution advances small sums of

money for no more than a day or two.

44.      Using common understanding, an overdraft occurs when two conditions are

satisfied. First, the consumer initiates a transaction that will result in the money in the account

falling below zero if the financial institution makes payment on the transaction. Second, the

financial institution pays the transaction by advancing its own funds to cover the shortfall. An

overdraft, therefore, is an extension of credit. The financial institution advancing the funds,

allows the account holder to continue paying transactions even when the account has no money in it, or the account has insufficient funds to cover the amount of the withdrawal.[13] The financial institution uses its own money to pay the transaction, on the assumption that the account holder will eventually cover the shortfall.

45.     Before the Federal Reserve amended The Electronic Fund Transfer Act (Regulation E) regarding requirements for overdraft services, many financial institutions unilaterally adopted internal "overdraft payment" plans. Consumers would initiate transactions that financial institutions would identify as "overdrafts," then the financial institution would cover the overdraft while charging the standard overdraft fee. Under such programs, consumers were charged a substantial fee—on average higher than the debit card transaction triggering the overdraft itself—without ever having made any choice as to whether they wanted such transactions approved or instead declined and providing the opportunity to select another form of payment rather than turning a $4 cup of coffee at Starbucks into a $40 cup of coffee.

46.     The Federal Reserve, which has regulatory oversight over financial institutions, recognized that banks and credit unions had strong incentives to adopt these punitive overdraft programs. Banks and credit unions could rely on charging high fees for very little service and almost no risk on thousands of transactions per day, giving consumers no choice in the matter if they wanted to have a bank account at all. It is for these reasons that in 2009, the Federal Reserve Board amended Regulation E to require financial institutions to obtain affirmative consent (or so-called "opt in") from accountholders for overdraft coverage on ATM and non-recurring "point of sale" debit card transactions. After Regulation E's adoption, a financial institution could only lawfully charge an overdraft fee on one-time debit card purchases and ATM withdrawals if the

---

[13] For a thorough description of the mechanics of an "overdraft," see https://www.investopedia.com/terms/o/overdraft.asp [last viewed October 18, 2021].

consumer opted into the financial institution's overdraft program. Otherwise, the bank or credit union could either cover the overdraft without charging a fee or, simply direct the transaction to be denied at the point of sale. Further, without the opt-in, the financial institution could not charge an NSF fee because denying an ATM withdrawal or one-time debit card purchase meant no transaction had ever taken place, and thus there was no transaction to return.

47.     After the CFPB's creation, it subsequently undertook the study referenced above regarding financial institutions' overdraft programs and whether they were satisfying consumer needs. Unsurprisingly, the CFPB found that overdraft programs had a series of problems. The most pressing problem was that overdraft services were costly and damaging to accountholders. The percentage of accounts experiencing at least one overdraft (or NSF) transaction in 2011 was 27%, and the average amount of overdraft and NSF-related fees paid by accounts that paid fees was $225. The CFPB further estimated that the banking industry may have collected anywhere from $12.6 to $32 billion in consumer NSF and overdraft fees in 2011, depending on what assumptions the analyst used in calculating the percentage of reported fee income should be attributed to overdrafts.  The CFPB also noted that there were numerous "variations in overdraft-related practices and policies," all of which could "affect when a transaction might overdraw a consumer's account and whether or not the consumer would be charged a fee."[14]

48.     Given the state of overdraft programs prior to Regulation E, it is easy to understand why the Federal Reserve was concerned about protecting consumers from financial institutions unilaterally imposing high fees.  Banks and credit unions in this scenario had significant advantages over consumers when it came to imposing overdraft policies. By

---

[14] The Federal Reserve has previously noted that "improvements in the disclosures provided to consumers could aid them in understanding the costs associated with overdrawing their accounts and promote better account management."  69 Fed. Reg. 31761 (June 7, 2004).

defaulting to charging fees for point-of-sale transactions, banks and credit unions created for themselves a virtual no-lose scenario—advance small amounts of funds (average $24) for a small period of time (average 3 days), then charge a large fee (average $34) that is unrelated to the amount of money advanced on behalf of the customer, resulting in a APR of thousands of percent interest (using averages - 17,000% APR), all while assuming very little risk because only a very small percentage of the overdraft customers failed to repay the overdraft.

49.    Because of this, Regulation E does not merely require a financial institution to obtain an opt-in disclosure agreement before charging fees for transactions that result in overdrafts. It also provides that the opt-in disclosure agreement must satisfy certain requirements to be valid. The agreement must be a stand-alone document, not combined with other forms, disclosures, or contracts provided by the financial institution. It must also accurately disclose to the account holder the institution's overdraft charge policies.  The account holder's choices must be presented in a "clear and readily understandable manner." 12 C.F.R. § 1005.4(a)(1). The financial institution must ultimately establish that the account holder has opted-in to overdraft coverage either through a written agreement, and through a confirmation letter to the customer confirming opt-in if the opt-in has taken place by telephone or computer after being provided a compliant opt-in disclosure agreement.

50.    Further, when the Federal Reserve amended Regulation E to require consumer opt-in for overdraft protection, it expected that financial institutions would not actively encourage opt-in as a means to recover lost revenue resulting from the opt-in requirement. This expectation was made clear in the official interpretation of the amendment which stated that "under Regulation DD,[15] advertisements may not be misleading or inaccurate" and similarly that

---

[15] Regulation DD applies to depository institutions other than credit unions. The equivalent for state-chartered credit unions is TISA, 12 C.F.R. § 707.1, *et seq.*

financial "institutions must not market their overdraft services in a manner that constitutes an unfair or deceptive practice within the meaning of the Federal Trade Commission Act, 15 U.S.C. 41, *et seq*." *See* Electronic Fund Transfers, 75 FR 31665-01, 2010 WL 2212981 (F.R. June 4, 2010). Further, after implementation of the Consumer Financial Protection Act of 2010, financial institutions were prohibited from engaging in any "unfair, deceptive, or abusive act or practice . . . in connection with any transaction with a consumer for . . . overdraft services." 12 U.S.C. § 5531(a).

51.    In the wake of Regulation E, some financial institutions simply decided to forego charging overdraft fees on non-recurring debit card and ATM transactions. These include large banks such as Bank of America, and smaller banks such as One West Bank, First Republic Bank, and Mechanics Bank. However, most financial institutions continued to maintain overdraft services on one-time debit card and ATM withdrawals. As such, these banks and credit unions must satisfy Regulation E's requirements in order to obtain compliant affirmative consent from their accountholders before charging overdraft fees on eligible transactions.

52.    But charging these exorbitant penalty fees for the bank or credit union's small advance of funds to cover overdrafts was not where it stopped. Many financial institutions began manipulating the process as to when they would consider a transaction an overdraft to further increase the profit generated by their overdraft programs. They charged overdraft fees no longer just when the financial institution actually advanced money on behalf of the customer but also on transactions when they paid the transaction with their customers' own money. That is, the financial institution unilaterally decided the account was overdrawn not by the actual lack of funds in the account, but by whether the money in the account minus holds the financial institution unilaterally decided was for future events was enough to cover an ATM or one-time

debit transaction when these transactions came in for payment at some future date.  In other words, they opted to use the "available balance" instead of the actual balance to assess overdraft and NSF fees.

53.     Most banks and credit unions calculate two account balances related to their accounting of a customer checking account. "Actual balance," "ledger balance," "current balance," or even "balance" are all terms used to describe the actual amount of the accountholder's money in the account at any particular time. In contrast, "available balance" is a term the financial industry recognizes as a balance reduced from the actual account balance by the amount the bank or credit union has either held from deposits or held from the account because of authorized debit transactions that have not yet come in (and may never come in) for payment.  But absent further explanation, terms like "available balance" have little or no meaning to reasonable consumers. As a result, it is important for financial institutions to clarify what "available balance" means because it is only by defining that term that consumers can know what it means.

54.     Although financial institutions calculate two balances, the actual/ledger/current balance of the money in the account is the official balance of the account. It is used when financial institutions report deposits to regulators, when they pay interest on an account, and when they report the amount of money in the account in monthly statements to the customer—the official record of the account.

55.     While there is no regulation barring any financial institution from deciding whether it will assess overdraft or NSF fees based on the actual balance or the "available balance" for overdraft assessment purposes, per Regulation E, the terms of the overdraft program must be clearly and accurately disclosed.  Whether the financial institution uses the actual money

in the account or an internal artificial available balance to assess overdraft fees, is information the customer needs to understand the overdraft program.

56.    Many financial institutions use the "available balance" for overdraft assessment purposes as it is consistent with these institutions' self-interest because the available balance is always the same or lower, by definition, than the actual balance. The actual balance includes all money in the account. The available balance, on the other hand, always subtracts any holds placed on the funds in the account that may affect the money in the account in the future. It never adds funds to the account. To be clear, even when a financial institution has put a hold on funds in an account, the funds remain in the account. The financial institution's "hold" is merely an internal characterization the bank or credit union uses to categorize some of the money. All of the account holder's money remains in the account, even the money Defendant has defined as "held." The fact that the money has a "hold" on it does not mean it has been removed from the account.

57.    The difference between which of the two balances a financial institution may use to calculate overdraft transactions is material to both the financial institution and account holders. Prior investigation in similar lawsuits demonstrates that financial institutions using the available balance, instead of actual balance, increase the number of transactions that are assessed overdraft fees approximately 10-20%. What happens in those 10-20% of transactions is that sufficient funds are in the account to pay the transaction and therefore the bank or credit union has not advanced any funds to the customer. At all times, the financial institution uses the customer's own money to pay the transaction, which really means there has never been an overdraft at all—yet the financial institution charges an overdraft fee on the transaction anyway.

58.     A hypothetical demonstrates what the financial institution is doing under these circumstances. Suppose that an individual has $1,000. The individual intends to use $800 of this amount to pay rent. The individual then intends to use the other $200 to make his monthly car payment. But before the rent and car payment come due, the individual receives a $40 water bill which informs that the bill must be paid immediately, or water service will be cut off. The individual now takes $40 from the money he has earmarked for his car payment to pay the water bill. This individual has not spent more money that he has on hand—but he does need to find an additional $40 before the car payment comes due. And if the individual does find the additional $40 before paying the car payment, there will never be a problem. If he falls short, he may choose to proceed with the transaction anyway, for example, by writing a check for the car payment when he does not have funds to cover the bill. He would then create a potential "overdraft" of his funds for the car payment, but not the rent payment and the water bill.

59.     The same pattern holds for financial institutions that calculate overdrafts using the actual (or ledger or current) balance of an account. Suppose the same individual put the $1,000 in his checking account under similar circumstances on the 27th of the month. That day, he also authorizes his $800 rent to be paid on the first of the next month, and his $200 car payment to be paid on the third of the next month. The individual then realizes that the $40 payment on his water bill must be paid that day—the 27th of the month—or he will incur a fee. He approves the water bill payment, and it posts immediately. Then, a few days later, he transfers an additional $40 into the account which is enough to offset the water bill payment before the initial $800 rent and $200 car payments post and clear the account. All three payments are made with the individual's own account funds.  The financial institution never uses its own funds as an advance, and there is no "overdraft" of the account because the balance always remains positive.

However, even if the customer does not transfer the $40, it is only the car payment which posts last that is paid without sufficient money in the account to cover it. Thus, there is only one transaction (*i.e.*, the car payment) eligible for an overdraft fee.

60.     A financial institution that uses the "available balance" method of calculating overdrafts would come to a different conclusion. Because the available balance subtracts from the account the amount of money that the financial institution is "holding" for other pending transactions, the financial institution considers the money set aside and unavailable, even though it is still in the account. This means that after the $800 and $200 transactions are scheduled, the "available balance" of the account is $0 even though $1,000 still remains in the account. Under these circumstances, when the individual makes the additional $40 payment and it posts first, the "available balance" is negative and the accountholder is charged an overdraft fee—even though the original $1,000 is still in the account. And what is worse, even if the accountholder deposits $40 in the account before the original $800 and $200 payments post and clear, he is still subject to the overdraft fee for the $40 transaction even though the financial institution never "covered" any portion of the payment with its own funds. Finally, what is worse still, if the customer does not make a deposit to cover the overdraft, the customer will be assessed an overdraft fee for all three transactions. Thus, using the available balance, although the financial institution only has to advance its own funds for one transaction (*i.e.,* the car payment), the financial institution will assess three overdraft fees tripling its profits from the same transactions.

61.     Financial institutions have been put on notice by regulators, banking associations, their insurance companies and risk management departments, and from observing litigation and settlements that the practice of using the available balance instead of the actual amount of money in the account (*i.e.*, the actual, ledger, or current balance) to calculate overdrafts *without clear*

*disclosure of that practice* likely violates Regulation E and state consumer laws. For instance, the

FDIC stated in 2019:

> Institutions' processing systems utilize an "available balance" method or a "ledger balance" method to assess overdraft fees. The FDIC identified issues regarding certain overdraft programs that used an available balance method to determine when overdraft fees could be assessed. Specifically, FDIC examiners observed potentially unfair or deceptive practices when institutions using an available balance method assessed more overdraft fees than were appropriate based on the consumer's actual spending or when institutions did not adequately describe how the available balance method works in connection with overdrafts.[16]

The CFPB provided in its Winter 2015 Supervisory Highlights, that:

> A ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared. Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (and an overdraft fee) under an available-balance method. At one or more financial institutions, examiners noted that these changes to the balance calculation method used were not disclosed at all, or were not sufficiently disclosed, resulting in customers being misled as to the circumstances under which overdraft fees would be assessed. Because these misleading practices could be material to a reasonable consumer's decision making and actions, they were found to be deceptive.[17]

62.    Under Regulation E, a financial institution may decide which balance it chooses

to use for overdraft fees on one-time debit card and ATM transactions, but it is also very clear

---

[16]https://www.fdic.gov/regulations/examinations/consumercomplsupervisoryhighlights.pdf   (last viewed October 18, 2021).

[17] https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf, p. 8 (last visited Nov. 10, 2020).

that financial institutions must disclose this practice accurately, clearly and in a way that is easily understood. As the Regulation E opt-in disclosure agreement must include this information in a stand-alone document, the use of available balance must be stated in the opt-in disclosure agreement to conform to Regulation E and permit the financial institution to charge a customer overdraft fees on one-time debit card and ATM transactions. Either inaccurately, ambiguously, or failing to describe the use of available balance as part of its overdraft practice violates the plain language of Regulation E.

**2.    TISA**

63.    TISA's purpose is to ensure that current and potential members of credit unions can make informed decisions about their accounts. 12 C.F.R. §707.1. It requires that credit unions present disclosures, clearly and conspicuously, in writing, and in a form that members can keep. 12 C.F.R. §707.3. The format of the disclosures must allow for easy and understandable review, and they must use the same terminology to describe account terms throughout. 12 C.F.R. §707, App. C. In addition, any advertisements or marketing of overdraft services must be done in an accurate and non-misleading way.  12 C.F.R. §707.8; 12 C.F.R. §707.11(b).

**C.    REPEAT FEES**

64.    Charging overdraft and NSF fees when there is money in an account to cover a transaction while failing to disclose this fact in violation of Regulation E is just one way that banks and credit unions manipulate checking accounts to increase profits. They also contract and disclose to customers that they will only charge a single NSF fee when they opt to return a check or ACH due to a lack of funds in the account. For ACH charges, the rejection of the electronic requested charge is completely automated, and results in no risk cost to the financial institution. There is also virtually no cost to administer the rejection as it is an automated computer function.

However, the NSF fee is the same as if the transaction was paid into overdraft by the financial institution. But what is worse, financial institutions like Defendant, not only charge one NSF fee for a returned item (up to $35 here), they charge multiple fees for insufficient funds on the same item and attempt to justify the practice as caused by a merchant submitting the same item for payment multiple times.

65.     Not only is this an unfair charge, it is not authorized by First Community's contracts with members. Those contracts do not disclose or permit the charging of multiple NSF fees based on the same transaction with the same merchant. Nor do they permit charging an NSF fee followed by an overdraft fee on the same item if the item is paid into overdraft on a second presentment. Instead, the agreements identify an insufficient funds fee as being singular on a per transaction, or item, basis.

### VII    FACTUAL ALLEGATIONS AGAINST FIRST COMMUNITY

### A.    FIRST COMMUNITY'S REGULATION E PRACTICES

66.     First Community opts members into its overdraft program using an opt-in disclosure agreement and procedures that violate Regulation E.

67.     On information and belief, the opt-in disclosure agreement is inaccurate and/or unclear because, *inter alia*, it does not inform Plaintiff and putative class members about First Community's method of assessing overdraft fees.  First Community uses an opt-in disclosure agreement that fails to state or clearly describe that an overdraft occurs when the "available balance" is below zero when that is its practice.  While the law permits First Community to use the "available balance," which takes into account various holds on funds that are in the account in calculating whether an overdraft has occurred, Regulation E equally requires First Community

to clearly and unambiguously disclose how it calculates overdrafts and under what conditions fees are charged.

68.     Many courts have already found that failing to clearly and accurately describe an overdraft program in an opt-in disclosure agreement can constitute a Regulation E violation.[18] By using inaccurate and/or ambiguous language to describe what constitutes an overdraft, First Community failed to provide the clear and easily understandable description of its overdraft services that Regulation E demands.

69.     Further, First Community uses opt-in methods that do not comply with Regulation E.  Based on information and belief, for those members who opt-in at a branch location, First Community does not read or otherwise provide the terms of its opt-in disclosure agreement (although inaccurate) prior to obtaining members' "consent" to join the program, which is a clear violation of Regulation E.  Further, based on information and belief, First Community fails to have members sign or affirm their consent to be included in the overdraft program as Regulation E requires, nor does First Community send members confirmation letters of their decision to opt-in, identifying that they can also opt-out at any time, which is another necessary step under

---

[18] *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1237-38; 1243-45 (11th Cir. 2019); *Wellington v. Empower Fed. Credit Union*, 2021 WL 1377789, *4 (N.D.N.Y Apr. 13, 2021); *Bettencourt v. Jeanne D'Arc Credit Union*, 370 F. Supp. 3d 258, 261-66 (D. Mass. 2019); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 855-57 (W.D. Mich. 2016); *Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338, 343- 46; 348 (D.N.H. 2018) (holding that terms such as "enough money," "insufficient funds," "nonsufficient funds," "available funds," "insufficient available funds," and "account balance" were ambiguous such that the Reg E claim was not dismissed ); *Smith v. Bank of Hawaii*, No. 16-00513 JMS-RLP, 2017 WL 3597522, at *6–8 (D. Haw. Apr. 13, 2017) ("sporadic" use of terms such as "available" funds or balances insufficiently explained to consumer when overdraft fee could be charged and ambiguous use of terms in opt-in agreement constituted a proper allegation of a Reg E violation); *Walker v. People's United Bank*, 305 F. Supp. 3d 365, 375-76 (D. Conn. 2018) (holding that allegations were sufficient to state a cause of action for violation of Reg E where opt-in form failed to provide customers with a valid description of overdraft program); *Ramirez v. Baxter Credit Union*, No. 16-CV-03765-SI, 2017 WL 1064991, at *4-8 (N.D. Cal. Mar. 21, 2017); *Gunter v. United Fed. Credit Union*, No. 315CV00483MMDWGC, 2016 WL 3457009, at *3-4 (D. Nev. June 22, 2016).

Regulation E.  Each of these actions or lack of actions constitutes a separate violation under Regulation E.

70.    Here, First Community failed to accurately, clearly, and in an easily understandable way disclose its overdraft policies, and it failed to provide its members with a Regulation E complaint opt-in disclosure agreement. Further, First Community fails to follow proper opt-in procedures when opting-in members to its Regulation E overdraft program.  Thus, it continues to charge Plaintiff and Class Members overdraft fees for non-recurring debit card and ATM transactions in violation of Regulation E. Further, on information and belief, First Community continues to "opt-in" new members to its overdraft program using the same improper opt-in disclosure agreement and/or opt-in procedures.

71.    The ODP disclosure that states "You can keep your *small oversights small* with Overdraft Privilege." In addition, the disclosure states that "FCCU can make sure that a *small concern won't get any bigger* with Overdraft Privilege." But there is nothing "small" about the fees associated with First Community's overdraft program.  In fact, using Overdraft Privilege incurs a fee anywhere from $10.00 to an astronomical $35.00 per item. The ODP disclosure provides further false, misleading, and/or deceptive information by stating "ensure your *safety net* is there if you need it and opt-in today" and "once your selection has been processed, *you will be covered if you need some extra cash for an emergency or unexpected situation."* First Community's disclosure and/or advertisement of its overdraft program as a "safety net" and stating that customers "will be covered" and given "extra cash" is a deceptive and misleading marketing tactic aimed at encouraging members to opt-in to the overdraft program, in violation of Regulation E.

72.     First Community knew, or should have known, that each of these improper actions or inactions constitutes a distinct, separate violation of Regulation E.

**B.     FIRST COMMUNITY'S TISA PRACTICES**

73.     First Community's overdraft disclosures, including, *inter alia,* its ODP disclosure, are false, misleading, and/or deceptive.

74.     The ODP disclosure that states "You can keep your *small oversights small* with Overdraft Privilege." In addition, the disclosure states that "FCCU can make sure that a *small concern won't get any bigger* with Overdraft Privilege." But there is nothing "small" about the fees associated with First Community's overdraft program.  In fact, using Overdraft Privilege incurs a fee anywhere from $10.00 to an astronomical $35.00 per item. The ODP disclosure provides further false, misleading, and/or deceptive information by stating "ensure your *safety net* is there if you need it and opt-in today" and "once your selection has been processed, *you will be covered if you need some extra cash for an emergency or unexpected situation."* First Community's disclosure and/or advertisement of its overdraft program as a "safety net" and stating that customers "will be covered" and given "extra cash" is a deceptive and misleading marketing tactic aimed at encouraging members to opt-in to the overdraft program, in violation of TISA (and in direct contravention to the guidance provided by regulators).

75.     First Community knew or should have known that this language falsely implies to members that opting-in is a cost-friendly solution, when in fact members are being charged exorbitant overdraft fees

76.     First Community knew or should have known that its marketing regarding the overdraft program, including, *inter alia,* the ODP disclosure, included false, misleading and deceptive information in violation of TISA.

C.    **FIRST COMMUNITY'S REPEAT FEES PRACTICES**

77.    At all relevant times, First Community has had an overdraft and NSF fee program in place which, *inter alia*, is: 1) contrary to the express and implied terms of its contracts with customers; 2) contrary to First Community's representations about NSF fees; and 3) contrary to First Community members' expectations regarding the assessment of such fees.

78.    First Community improperly charges multiple fees for the same electronic transaction or item.  First Community charges a $35 fee when an electronic transaction or item is first processed for payment and First Community determines that there is not enough money in the account to cover the transaction.  First Community then charges an *additional* NSF or overdraft fee if the same item is presented for processing again by the payee.

79.    First Community's practice of charging additional NSF or overdraft fees for the representment of the same item violates the "January 2021 Deposit Agreement" (hereinafter "Account Agreement").  (The January 2021 Account Agreement is attached hereto as Ex. 1.) The Account Agreement constitutes a uniform written contract that First Community entered with Plaintiff and other Class Members.

80.    But the Account Agreement does not permit First Community's practice of charging multiple fees on the same item.  Instead, First Community provides in the Account Agreement that if sufficient funds are not available in a customer's checking account, "the payment would normally be returned to the payee or denied for insufficient funds, and you may be charged *a Rejected Item Fee.*" The Account Agreement further states "if sufficient funds are not available, then any such item presented may be returned to the payee due to insufficient available funds and *a charge* will be made to your account." The Account Agreement thus

provides for a single insufficient funds charge for an item, not multiple charges for the same item.

81.    Furthermore, although Plaintiff does not know at this time whether First Community's Fee Schedule was ever given to Class Members so as to make it binding, and this will require discovery, the Fee Schedule permits First Community to charge only a single insufficient funds charge per item. First Community's Fee Schedule states "*Rejected Item (Paid or Returned)…*See ODP *Items* Above." When referring to the "ODP Items Above," the Fee Schedule states "1st *item* within a rolling 12 month period...................$10.00; 2nd to 4th *items* within a rolling 12 month period.......$28.00 ea.; 5th item or more within a rolling 12 month period........$35.00 ea." The strong *per item* language, including stating that a fee is charged for *each item*, further reinforces that First Community was only authorized to charge a single insufficient funds charge per item, not multiple charges for the same item.

82.    The ODP disclosure also limits First Community to charging a single insufficient funds fee per item. First Community states "if you use your ODP, *each item will be assessed a fee for each use.*" First Community also states, "Anything that comes in and is over your established limit, may result in an item being returned to the payee. In such a case, the normal Rejected Item Fee will be charged *per item* and assessed to your account." As such, the ODP disclosure also refers to a singular insufficient funds charge for each item.

83.    First Community's standardized contracts and disclosures misrepresented that it would only charge a single fee per item, when it actually charges multiple fees on the same item. Further, because First Community charged NSF and overdraft fees improperly, and because First Community's improper deduction of the additional improper $35 fee further decreased members' "balance" or "available balance," these charges likely generated even more NSF fees or overdraft

fees to the account.

84.    Courts in various jurisdictions have recognized that when banks and credit unions charge multiple NSF fees on the same item while failing to clearly disclose such practice, it gives rise to claims and causes of action on a class wide basis. *See e.g.*, *Morris v. Bank of America*, No. 3:18-cv-00157-RJC-DSC, 2019 WL 1274928 (W.D.N.C., March 29, 2019) (Order denying motion to dismiss allegations regarding improper repeat NSF claims); *Tannehill v. Simmons Bank*, No. 3:19-cv-140-DPM, Docket No. 23 (E.D. Ark., Oct. 21, 2019) (Order denying motion to dismiss repeat NSF claims); *Garcia v. UMB Bank NA*, No. 1916-CV01874 (Jackson Co., Missouri, Circuit Court, Oct. 18, 2019) (Order denying motion to dismiss repeat NSF claims); *Tisdale v. Wilson Bank and Trust*, No. 19-400-BC (Davidson Co. Tenn., Chancery Court, Oct. 17, 2019) (Order denying motion to dismiss repeat NSF claims); *Noe v. City National Bank of West Virginia*, Civil Action No. 3:19-0690 (S.D.W.V. Feb. 19, 2020) (Order denying motion to dismiss repeat NSF claims); *Ingram v. Teachers Credit Union*, Cause No. 49D01-1908-PL 035431 (Indiana Commercial Court, Marion County Superior Court) (Order denying motion to dismiss repeat NSF claims); *Perks, et al. v. TD Bank, N.A.,* Civil Action No. 18-CV-11176 (S.D.N.Y. Mar. 17, 2020) (Order denying motion to dismiss breach of contract claim for repeat NSF fees); and *Coleman, et al. v. Alaska USA Federal Credit Union*, Civil Action No. 3:19-cv0229-HRH (D. Alaska Apr. 14, 2020) (Order denying motion to dismiss plaintiffs' breach of contract and good faith and fair dealing claims for repeat NSF fees).

85.    Moreover, unlike First Community, other banks and credit unions have been able to properly contract and disclose the practice of charging multiple fees for the representment of the same item.  For example, Air Academy Federal Credit Union clearly states: an NSF fee is "$32.00 per presentment."

86.     Central Pacific Bank contracts unambiguously:

> Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF") funds in your account, may be resubmitted one or more times for payment, and a $32 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds.

87.     Delta Community Credit Union states its NSF fee is "$35 per presentment."

Further, in its Account Agreement, Delta unambiguously states as follows:

> The Credit Union reserves the right to charge you an overdraft/insufficient funds fee if you write a check or initiate an electronic transaction that, if posted, would overdraw your Checking Account.  Note that you may be charged an NSF fee each time a check or ACH is presented to us, even if it was previously submitted and rejected.

88.     Glendale Federal Credit Union lists its NSF fee as "$30 per presentment."

89.     First Financial Bank contracts unambiguously:

> Merchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representment).  Each presentment is considered an item and will be charged accordingly."

90.     First Northern Credit Union lists its NSF fee as "$22.00 per each presentment and any subsequent presentment(s)."  Further, in its Account Agreement, First Northern unambiguously states as follows:

> You further agree that we may charge a NSF fee each time an item is presented for payment even if the same item is presented for payment multiple times.  For example, if you wrote a check to a merchant who submitted the payment to us and we returned the item (resulting in a NSF fee), the merchant may re-present the check for payment again.  If the second and any subsequent presentments are returned unpaid, we may charge a NSF fee for each time we return the item.  You understand this means you could be charged multiple NSF fees for one check that you wrote as that check could be presented and returned more than once.

Similarly, if you authorize a merchant (or other individual or entity) to electronically debit your account, such as an ACH debit, you understand there could be multiple submissions of the electronic debit request which could result in multiple NSF fees.

91.    Liberty Financial states its NSF fee is "27.00 per presentment."

92.    Los Angeles Federal Credit Union lists its NSF fee as "$29 per presentment."

93.    Members First Credit Union states:

We reserve the right to charge a Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once…we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment . . . .

94.    Meriwest Credit Union lists its fee as "$35.00/item per presentment."

95.    Partners 1st Federal Credit Union states:

Consequently, because we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item.  Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

96.    Regions Bank states:

If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item.  If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item.

97.     Tyndall Federal Credit Union lists its NSF fee as "$28.00 per presentment (maximum 5 per day)."

98.     Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

99.     Meanwhile, Plaintiff and the Class Members could not have reasonably anticipated the harm resulting from Defendant's practice throughout the class period because the Account Agreement, Fee Schedule, and other disclosures specifically stated that only a singular fee would be charged for "an" item.

D.      **FIRST COMMUNITY'S DTPA VIOLATIONS**

100.    First Community states in its ODP disclosure that "you can keep your *small oversights small* with Overdraft Privilege (ODP). FCCU can help make sure that a small concern *won't get any bigger* with Overdraft Privilege." First Community goes on to state that members should opt in to "ensure your *safety net* is there" and that "once your selection has been processed, *you will be covered if you need some extra cash* for an emergency or unexpected situation." This language falsely, misleadingly, and/or deceptively implies that opting-in is a cost-friendly solution, when in fact members are being charged exorbitant fees.

101.    At all relevant times, First Community knew or should have known its practices in violation of Regulation E and TISA also violate the DTPA. Further, First Community's actions are independently actionable under the DTPA, because they constitute "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and "unconscionable action[s] or course[s] of action," which means an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience,

or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

102.    By falsely, misleadingly, and/or deceptively advertising its overdraft program, unilaterally and without authorization charging multiple NSF fees for the same item, failing to utilize a compliant opt-in disclosure for the overdraft privilege program and failing to obtain affirmative customer consent in violation of Regulation E, failing to provide written confirmation of a customer's opted-in status, as well as right to opt-out, in violation of Regulation E,  and marketing its overdraft disclosures in a deceptive and misleading manner, First Community has violated the Texas DTPA.

**E.    PLAINTIFF'S HARM**

103.    Plaintiff has held an account with First Community at all times relevant to the allegations and is believed to be opted into its overdraft program for debit card and ATM transactions.

104.    As will be established using First Community's own records, Plaintiff has been assessed numerous improper fees on debit card and ATM transactions. For example, on August 28th, 2021, Plaintiff had a debit card transaction in the amount of $9.72 for "Prime Video." As a result of this transaction, Plaintiff was charged a $35.00 "Overdraft Privilege" fee. Other instances of such fees are likely to be discovered once there has been reasonable time for further investigation.

105.    Plaintiff was also harmed by First Community's policy and practice of charging multiple NSF fees, or an NSF fee followed by an overdraft fee, on same "item."  It will be necessary to obtain First Community's records to determine each instance of such a wrongful fee; however, Plaintiff has already uncovered some examples. Based on information and belief,

on September 27, 2021, First Community charged Plaintiff an "Insufficient Funds Charge" totaling $35.00 after Plaintiff initiated PayPal Instant transfer "210925." Then, when PayPal (through no action of Plaintiff) on that same day resubmitted the transfer, First Community charged an additional $35.00 NSF fee.  Further, on September 27, 2021, Plaintiff initiated PayPal Instant transfer "210926," which First Community rejected and charged an "Insufficient Funds Charge" totaling $35.00. Based on information and belief, that same transaction was resubmitted by PayPal and First Community rejected it an additional two times on September 27, 2021, incurring two additional $35.00 fees. Thus, this single transaction incurred a total of three charges on September 27, 2021.  These additional fees were not authorized by the Account Agreement or any other document, which all provide for only one fee to be assessed on an item.

106.    First Community's assessment, and unilateral taking of, improper NSF fees further reduced the balance and amount of funds in members' accounts, resulting in and aggressively causing subsequent, otherwise non-NSF transactions to be improperly treated as transactions for which First Community's assessed further NSF fees.  A complete evaluation of First Community's records is necessary to determine the full extent of Plaintiff's and Class Members' harm from this practice.

107.    Plaintiff did not and could not have, exercising reasonable diligence, discovered both that she had been injured and the actual cause of that injury until she met with her attorneys in 2021. While Plaintiff understood that she was assessed fees, she did not understand the cause of those fees until 2021 because First Community hid its actual practices from its members by describing different practices in agreements and other materials it disseminated to its members. This not only reasonably delayed discovery, but First Community's affirmative representations

and actions also equitably toll any statute of limitations, and also additionally equitably estop First Community.

## VIII    CLASS ACTION ALLEGATIONS

108.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

109.    Plaintiff brings this case, and each of the respective causes of action, as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(1), (b)(2) and (b)(3) on behalf of the following Class.

110.    The "Class" is composed of the following:

**The Regulation E Class:**

> **All members of First Community who have or have had accounts with First Community who were assessed an overdraft fee on a one-time debit card or ATM transaction during the period beginning one year preceding the filing of this Complaint and ending on the date the Class is certified. Following discovery, this definition will be amended as appropriate.**

**The Repeat NSF Class:**

> **All United States residents who have or have had accounts with First Community who incurred more than one NSF fee or an NSF fee following by an overdraft fee on the same item during the period beginning four years preceding the filing of this Complaint and ending on the date the Class is certified.**

**The DTPA Class:**

> **All members of First Community who have or have had accounts with First Community who were assessed an overdraft fee on a one-time debit card or ATM transaction during the period beginning one year preceding the filing of this Complaint and ending on the date the Class is certified. Following discovery, this definition will be amended as appropriate.**

111.    Excluded from the Classes are: 1) any entity in which First Community has a controlling interest; 2) officers or directors of First Community; 3) this Court and any of its employees assigned to work on the case; and 4) all employees of the law firms representing Plaintiff and the Class Members.

112.    This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Federal Rules of Civil Procedure, Rule 23.

113.    **Numerosity (Federal Rules of Civil Procedure, Rule 23(a)(1))** – The members of the Class are so numerous that joinder of all members would be impracticable.  While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes based on the percentage of customers that are harmed by these practices with banks and credit unions with similar practices, that the Class is likely to include thousands of members.

114.    Upon information and belief, First Community has databases, and/or other documentation, of its members' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of First Community's members has been harmed by its practices and thus qualify as a Class Member.  Further, the Class definition identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice through mail or email, alternative proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

115.    **Commonality (Federal Rules of Civil Procedure, Rule 23(a)(2))** – This action involves common questions of law and fact.  The questions of law and fact common to both

Plaintiff and the Class Members include, but are not limited to, the following:

- Whether, pursuant to the Account Agreement, First Community contracted that it would only charge "a" single fee for an NSF "item" rather than charge repeat fees for the same "item."

- Whether First Community breached the Account Agreement, ODP disclosure and/or Fee Schedule by assessing repeat fees on the same "item."

- Whether First Community used and/or uses the available balance for making a determination of whether to assess overdraft fees on one-time debit card and ATM transactions.

- Whether the opt-in disclosure agreement First Community used and/or uses to opt-in Class Members violates Regulation E because it does not accurately, clearly, and in an easily understandable way describe First Community's overdraft services.

- Whether First Community violated Regulation E when it assessed overdraft fees on one-time debit card and ATM transactions against Class Members.

- Whether First Community violated Regulation E by using improper opt-in methods and failing to send members a confirmation letter indicating their opt-in decision.

- Whether First Community violated TISA by promoting its overdraft services in an inaccurate and/or misleading way.

- Whether First Community's conduct in violation of Regulation E also violates the Texas DTPA.

- Whether First Community's conduct in violation of TISA also violates the Texas DTPA.

- Whether First Community continues to violate Regulation E, TISA, and/or the Texas DTPA, by opting in members and the public using an inaccurate opt-in disclosure agreement and improper opt-in procedures, and continuing to assess members overdraft fees on one-time debit card and ATM transactions based on an improper opt-in disclosure agreement and procedures.

- Whether the language in the ODP disclosure is false, misleading and/or deceptive in violation of TISA, Reg E and/or the Texas DTPA.

- Whether First Community is liable for breaching the covenant of good faith and fair dealing, unjust enrichment and money had and received.

116.   **Typicality (Federal Rules of Civil Procedure, Rule 23(a)(3))** – Plaintiff's claims are typical of all Class Members.  The evidence and the legal theories regarding First Community's alleged wrongful conduct committed against Plaintiff and all of the Class Members are substantially the same because all of the relevant agreements between First Community and its members were identical as to all relevant terms, and because First Community's challenged practices in violating its contracts, disclosures, and Regulation E are uniform for Plaintiff and all Class Members.  Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class Members.

117.   **Adequacy (Federal Rules of Civil Procedure, Rule 23(a)(4))** – Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained competent counsel experienced in class action litigation to ensure such protection.  There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that

would make class certification inappropriate.  Plaintiff and her counsel intend to prosecute this action vigorously.

118.    **Predominance and Superiority (Federal Rules of Civil Procedure, Rule 23(b)(3))** – The matter is properly maintained as a class action under Rule 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members.  Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter.  Because the injuries suffered by the individual Class Members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class Members to individually seek redress for First Community's wrongful conduct. Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.  In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing First

Community's violations of law to proceed without remedy and allowing First Community to retain the proceeds of its ill-gotten gains.

119.    Plaintiff's claims are typical of the other Class Members and that she will adequately represent the Class.  This particular forum is desirable for this litigation because First Community's headquarters are located in this District and the claims arose from activities that occurred largely in this District.  Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

120.    Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members.  Upon information and belief, First Community's own business records and/or electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiff anticipates using additional media and/or mailings.

121.    This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure in that without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

- inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

- adjudication with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

122. Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

- the interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

- the extent and nature of any litigation concerning the controversy already commenced by or against members of the Class;

- the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

- the difficulties likely to be encountered in the management of a class action.

**IX**     <u>**CAUSES OF ACTION**</u>

**FIRST CAUSE OF ACTION**

**(Violation of Regulation E)**

123. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

124. By charging overdraft fees on ATM and non-recurring debit card transactions, Defendant violated Regulation E, 12 C.F.R. §§ 1005, *et seq*., whose "primary objective" is "the protection of individual consumers," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et seq*., the 'EFTA,'" 12 C.F.R. § 1005.1(b).

125. Specifically, the charges violated what is known as the "Opt In Rule" of Regulation E. 12 C.F.R. § 1005.17. The Opt In Rule states: "a financial institution . . . *shall not*

*assess a fee or charge* . . . pursuant to the institution's overdraft service, *unless* the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program. *Id*. (emphasis added). The notice "shall be clear and readily understandable." 12 C.F.R. § 1005.4(a)(1). To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17. Furthermore, choosing not to "opt-in" cannot adversely affect any other feature of the account.

126. The intent and purpose of this opt-in disclosure agreement is to "assist customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate</u> . . . by <u>explaining</u> the institution's overdraft service . . . in a <u>clear and readily understandable way</u>"—as stated in the Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 59040, 59048, which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 179 F. Supp. 3d 320, 324 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).

127. Defendant failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution may assess overdraft fees against

members' accounts through an overdraft program for ATM withdrawals and non-recurring debit card transactions. Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its members with a stand-alone disclosure agreement that in a "clear and readily understandable way" describes the overdraft program, meeting the strictures of 12 C.F.R. § 1005.17. Specifically, on information and belief, the opt-in disclosure agreement does not accurately and in an easily understandable manner describe First Community's overdraft services including, but not limited to, failing to clearly describe that an overdraft occurs when the "available balance" is below zero when that is its practice.

128.    As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining valid affirmative consent to do so, Defendant was not legally permitted to assess any overdraft fees on one-time debit card or ATM transactions, and it has harmed Plaintiff and the Class Members by assessing overdraft fees on one-time debit card and ATM transactions.

129.    Defendant also violated Regulation E by using improper opt-in methods and failing to send members a confirmation letter indicating their opt-in decision.

130.    Further, Defendant violated Regulation E by promoting its overdraft services in an inaccurate and/or misleading way.

131.    As the result of Defendant's violations of Regulation E, 12 C.F.R. § 1005, *et seq.*, Plaintiff and members of the Class are entitled to statutory damages, as well as attorneys' fees and costs of suit, pursuant to 15 U.S.C. § 1693m.

### SECOND CAUSE OF ACTION

### (Breach of the Account Agreement)

132.    The preceding allegations are incorporated by reference and re-alleged as if fully

set forth herein.

133. Plaintiff and each of the Class Members entered into the Account Agreement. The Account Agreement was drafted by and is binding on First Community.

134. Among other promises, First Community promised that it would assess only a single NSF fee for an unpaid, returned item due to purported insufficient funds when, in practice, it charged a $35.00 fee when an electronic transaction or item was first processed for payment and First Community determined that there was not enough money in the account to cover the transaction, and then charged an *additional* NSF fee, or an NSF fee followed by an overdraft fee, if the same item was presented for processing again by the payee, even though the account holder took no action to resubmit the item for payment.

135. First Community's practice violates the Account Agreement, which provides only that it can charge a singular "insufficient funds fee" for a single item. Yet First Community wrongfully treated the representment of an item as a new and separate "item" justifying an additional NSF or overdraft fee in violation of the Account Agreement.

136. For these reasons, the Account Agreement fails to accurately describe the circumstances when First Community will charge Plaintiff and Class Members certain NSF and overdraft fees.

137. Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Agreement, except for those they were prevented from performing or which were waived or excused by First Community's misconduct.

138. First Community breached the terms of the Account Agreement by, *inter alia*, assessing multiple fees for the same electronic transaction or item.

139.    As a proximate result of First Community's breaches, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

**THIRD CAUSE OF ACTION**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

140.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

141.    Plaintiff and each of the Class Members entered into the Account Agreement. The Account Agreement was drafted by, and is binding upon, First Community.  In the agreement, First Community promised it would only charge a single NSF fee for an item.  Yet First Community assessed NSF (and/or overdraft) fees multiple times for the same electronic item.

142.    Further, good faith is an element of every contract.  Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

143.    The material terms of the Account Agreement therefore include the implied covenant of good faith and fair dealing, whereby First Community covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class Member fairly

and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class Members' rights and benefits under the contracts.

144.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by First Community's misconduct.

145.    First Community breached the implied covenant of good faith and fair dealing based, *inter alia*, on its practices of assessing multiple NSF fees for a single, unpaid returned item. First Community could easily have avoided acting in this manner by simply changing the programming in its software to charge a fee only once per item.  Instead, First Community unilaterally elected to and did program its software to charge multiple fees each time the same item was represented for payment by a merchant which would maximize its NSF fee revenue.  In so doing, and in implementing its NSF fee program for the purpose of increasing and maximizing NSF fees, First Community executed its contractual obligations, including any discretion it had, in bad faith, depriving Plaintiff and the Class Members of the full benefit of the Account Agreement.

146.    As a proximate result of First Community's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## FOURTH CAUSE OF ACTION

### (Unjust Enrichment/Restitution)

147.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

148.     As a result of the wrongful misconduct alleged above, First Community unjustly received millions of dollars in NSF fees.

149.     Because Plaintiff and the Class Members paid the erroneous NSF and overdraft fees assessed by First Community, Plaintiff and the Class Members have conferred a benefit on First Community, albeit undeservingly.  First Community has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, First Community would be unjustly enriched.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

## FIFTH CAUSE OF ACTION

### (Money Had and Received)

150.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

151.     First Community has obtained money from Plaintiff and the Class Members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

152.     As a result, First Community has in its possession money which, in equity, belongs to Plaintiff and the Class Members, and thus, this money should be refunded to Plaintiff and the Class Members.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

## SIXTH CAUSE OF ACTION

### (Violation of the Deceptive Trade Practices Act – Consumer Protection Act)

### (Tex. Bus. & Com. Code §§ 17.41, *et seq.*)

153.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

154.    Plaintiff and members of the class are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets) who sought or acquired by purchase or lease, goods or services, see Tex. Bus. & Com. Code § 17.41, and are therefore "consumers," pursuant to Texas Business and Commercial Code § 17.45(4). First Community is a "person" within the meaning of Texas Business and Commercial Code § 17.45(3).

155.    First Community is engaged in "trade" or "commerce" or "consumer transactions" within the meaning of Texas Business and Commercial Code § 17.46(a).

156.    First Community's conduct described herein violates the DTPA, which prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," a Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means an act or practice which, to a consumers detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3). The DTPA permits violations of other laws to serve as the basis of an independent actionable DTPA claim and sweeps within its scope acts and practices not specifically proscribed by any other law.

157.    The DTPA expressly provides for injunctive relief, and contains provisions denoting its public purpose. A claim for injunctive relief under the DTPA is brought by a

plaintiff acting in the capacity of a private attorney general. Although the private litigant controls the litigation of an unfair competition claim, he or she is not entitled to recover compensatory damages for his or her own benefit, but only disgorgement of profits made by the defendant through unfair competition in violation of the statutory scheme, or restitution to victims of the unfair competition.

158.    As further alleged herein, First Community's conduct violates the DTPA because that conduct violates public policy, TISA, and/or the text of Regulation E.  At a minimum, First Community violated the DTPA by representing that the its overdraft program had characteristics, uses, benefits, and qualities which it did not have; representing its overdraft program in a deceptive and misleading manner in violation of TISA and Regulation E, failing to follow proper opt-in procedures, including but not limited to, providing a clear, readily understandable opt-in disclose agreement and written confirmation of Plaintiff's opted-in status and right to revoke in violation of Regulation E; and representing that the ODP disclosure conferred or involved rights, remedies or obligations which it did not have, and which was prohibited by law.

159.    In the course of its business, Defendant knew or should have known, that in order to legally charge its members overdraft fees, it was required to first obtain affirmative consent from members using a Regulation E compliant stand-alone opt-in disclosure agreement that accurately disclosed all material parts of its overdraft program in clear and easily understood language. Yet, on information and belief, Defendant did not disclose this information; it concealed and suppressed material facts concerning how it charged overdraft fees in the disclosure agreement, intending to induce Plaintiff and the class to enter into the transaction. Plaintiffs would not have entered into the transaction on the same terms had the information about Defendant's overdraft practices been disclosed in compliance with Regulation E.

160.    The omissions and acts of concealment by Defendant pertained to information that was material to Plaintiff and the Class members, as it would have been to all reasonable consumers.

161.    First Community's conduct was not motivated by any legitimate business or economic need or rationale. The harm and adverse impact of First Community's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives. The harm to Plaintiff and Class Members arising from Defendant's unlawful practices relating to the imposition of the improper fees outweighs the utility, if any, of those practices.

162.    Defendant's unlawful business practices as alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Class Members, and the general public. First Community's conduct was substantially injurious to Plaintiff and the Class Members as they have been forced to pay millions of dollars in improper fees, collectively.

163.    As a direct and proximate result of First Community's violations of the DTPA, Plaintiff and Class Members have been assessed improper and illegal NSF/overdraft fees and those funds removed from their account, and First Community has received, or will receive, income, profits, and other benefits, which it would not have received if it had not engaged in the violations described in this Complaint.

164.    Further, absent injunctive relief forcing First Community to disgorge itself of its ill-gotten gains and public injunctive relief prohibiting First Community from misrepresenting information concerning its NSF/overdraft fee policy at issue in this action in the future and requiring First Community to immediately stop charging illegal NSF/overdraft fees in violation

of its contracts and other disclosures, Plaintiff, account holders, and the general public, will suffer from and be exposed to First Community's conduct violative of the DTPA.

165.    Plaintiff and Class members suffered ascertainable loss and actual damages as a direct and proximate result of First Community's misrepresentations and failure to comply with Regulation E, TISA, and otherwise misrepresenting and falsely advertising its overdraft program.

166.    First Community's conduct was a producing cause of Plaintiff's and the Class' losses.

167.    First Community's violations present a continuing risk to Plaintiff as well as to the general public. First Community's unlawful acts and practices complained of herein affect the public interest.

168.    Pursuant to Texas Business and Commercial Code § 17.50, Plaintiff and the Class seeks an order enjoining First Community's unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

169.    On November 4, 2021, Plaintiff sent a letter complying with Texas Business and Commercial Code § 17.505(a).

## X    **PRAYER**

WHEREFORE, PLAINTIFF and CLASS MEMBERS pray for judgment as follows:

1.    For an order certifying this action as a class action;

2.    For actual damages, statutory damages, and restitution on all applicable claims and in an amount to be proven at trial;

3.    For an order requiring First Community to disgorge, restore, and return all monies

wrongfully obtained together with interest calculated at the maximum legal rate;

4.    For an order enjoining the wrongful conduct alleged herein;

5.    For costs;

6.    For pre-judgment and post-judgment interest as provided by law; and

7.    For such other relief as the Court deems just and proper.


DATED:  November 10, 2021                          Respectfully submitted,

*/s/ Bruce W. Steckler*
Bruce W. Steckler
(TX Bar No. 00785039)
**STECKLER WAYNE COCHRAN**
**CHERRY PLLC**
12720 Hillcrest Road, Suite 1045
Dallas, Texas 75230
Telephone: (972) 387-4040
Facsimile: (972) 387-4041
Email: bruce@swclaw.com

Richard D. McCune
(CA State Bar No. 132124)*
David C. Wright
(CA State Bar No. 177468)*
**MCCUNE WRIGHT AREVALO, LLP**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557 1275
Email: rdm@mccunewright.com
          dcw@mccunewright.com

Emily J. Kirk
(IL Bar No. 6275282)*
**McCUNE WRIGHT AREVALO, LLP**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone: (618) 307-6116
Email: ejk@mccunewright.com

*Attorneys for Plaintiff Jaimie Heard*
*and the Putative Class*

*\*Pro Hac Vice* applications to be submitted

## DEMAND FOR JURY TRIAL

PLAINTIFF, on behalf of herself and all others similarly situated, demands a jury trial with respect to all issue triable of right by jury.

DATED:  November 10, 2021

*/s/ Bruce W. Steckler*
Bruce W. Steckler
(TX Bar No. 00785039)
**STECKLER WAYNE COCHRAN
CHERRY PLLC**
12720 Hillcrest Road, Suite 1045
Dallas, Texas 75230
Telephone: (972) 387-4040
Facsimile: (972) 387-4041
Email:  bruce@swclaw.com

Richard D. McCune
(CA State Bar No. 132124)*
David C. Wright
(CA State Bar No. 177468)*
**MCCUNE WRIGHT AREVALO, LLP**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557 1275
Email: rdm@mccunewright.com
        dcw@mccunewright.com

Emily J. Kirk
(IL Bar No. 6275282)*
**McCUNE WRIGHT AREVALO, LLP**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone: (618) 307-6116
Email: ejk@mccunewright.com

*Attorneys for Plaintiff Jaimie Heard
and the Putative Class*

*\*Pro Hac Vice* applications to be submitted